BAUGH CONSTRUCTION CO., a
Washington corporation,
Plaintiff–Appellee,

v.

MISSION INSURANCE CO., a
California corporation, et al.,
Defendants,

and

The Underwriters at Lloyd's A Great
Britain corporation,
Defendant–Appellant.

BAUGH CONSTRUCTION CO.,
Plaintiff–Appellee,

v.

MISSION INSURANCE CO., Sayre &
Toso, Inc., Harbor Insurance, American
Reinsurance, C.V. Starr & Company,
The Underwriters at Lloyd's, Granite
State Insurance Co., and The Central
National Insurance Company of Omaha, Defendants,

and

Holland America Insurance Corp.,
Defendant–Appellant.

Nos. 85–3763, 85–3770.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1987.

Decided Jan. 5, 1988.

As Amended Feb. 23, 1988.

Mark Thorsrud, David A. Shaw, Tewell, Thorpe & Findlay, Inc., Seattle, Wash., for Holland America Insurance Corp.

Robert K. Waitt, Waitt, Johnson & Martens, Seattle, Wash., for Underwriters at Lloyd's.

John T. Petrie and Sarah Weaver, Diamond & Sylvester, Seattle, Wash., for plaintiff-appellee.

Before FLETCHER, BOOCHEVER and NORRIS, Circuit Judges.

BOOCHEVER, Circuit Judge:

Baugh Construction Company (Baugh) commenced a declaratory action against several third-party liability insurers seeking indemnity and reimbursement for its costs in defending claims asserted by Kilroy Industries, Inc. (Kilroy). Jurisdiction is based on diversity. 28 U.S.C. § 1332 (1982). The claims arose out of Baugh's construction of an office building. Baugh sought damages from Holland America Insurance Corporation (Holland) for breach of Holland's duty to defend Baugh and for indemnification under the Holland policy. Baugh also sought to recover damages from the Underwriters at Lloyd's (Lloyd's) for the alleged breach of its duty to defend. The district court found that both insur-ance companies breached their duty to defend Baugh and that Holland also breached its duty to indemnify. With certain exceptions, we affirm as to Lloyd's but reverse the judgment against Holland.

## FACTS

In 1978, Baugh started construction on an eleven-story structure known as Sea Tac Tower II (Tower II) for Kilroy. Structural design plans for the tower were supplied by NAM Engineering. Between June 1978 and March 1979, Baugh poured the building's foundation, the lower and upper plazas, and floors two through seven. During that period, Holland insured Baugh under a broad form property damage policy covering Baugh's liability for damage to the "property of others."

Lloyd's insured Baugh from March 31, 1979, through March 31, 1983, under four property damage liability policies. During Lloyd's policy period, Baugh completed construction of the building, and Kilroy commenced construction and installation of tenant improvements.

Baugh commenced a lien foreclosure and breach of contract action against Kilroy in June 1980. Kilroy counterclaimed in July 1980, asserting a variety of claims against Baugh for breach of contract, including claims for delay in performance, noneffi-cient performance, overbilling, inadequate supervision, and wrongful billing for warranty repairs. The Kilroy counterclaim was amended in September 1980, and again generally alleged that "Contractor [had] failed ... to correct defective materials and workmanship," and that "there were numerous additional breaches by contractor with resultant damages to Owner, the details of which will be proved at time of trial."

Not until Kilroy again amended its counterclaim in December 1981 did it specifically allege the claims most critical to this litigation: negligent design and construction of Tower II, and failure to deliver a building meeting contract specifications. The amended counterclaim sought all damages resulting from the alleged negligent design and construction, including damages

for lost use of Tower II, reduced life of the building, reduced rental income, loss of tenants, reduced value of the building, and costs of remedying the defects.

These allegations stemmed from recent discoveries that Baugh apparently had laid floor slabs that lacked adequate reinforcing steel, and that Tower II's seismic resistance system was defective. Upon investigation, the King County Building and Land Development Division determined that the floor slabs were not in compliance with the Uniform Building Code. Amid substantial local publicity, King County, on August 13, 1982, ordered that Tower II be vacated due to the inadequacy of its seismic resistance system. Eventually Baugh, pursuant to a settlement agreement with Kilroy, repaired Tower II's structural problems, a process that necessitated the destruction and replacement of Kilroy's tenant improvements.

Baugh first notified Holland of Kilroy's allegations on November 19, 1981. The notice included Kilroy's September 1980 counterclaim and a letter from Baugh's attorneys, notifying the carrier of its duty to defend Baugh and its potential liability for defense costs should it fail to defend. Holland denied coverage and refused to defend Baugh, both then and again after receiving Kilroy's December 1981 amended counterclaim, which for the first time specifically alleged negligent design and construction, and made claims for the resulting damages.

Baugh first notified Lloyd's of Kilroy's allegations on June 29, 1982. The notice included Kilroy's December 1981 amended counterclaim and a letter, dated June 22, 1982, from Baugh's attorneys, Diamond & Sylvester, detailing the more recent allegations of defective floors, diminution in value of the building, and damage to tenant improvements. Lloyd's did not accept Baugh's tender of defense until February 14, 1983, when Lloyd's appointed Barokas & Martin to defend Baugh. Diamond & Sylvester continued to handle Baugh's defense until May 1983, when the firm formally associated with Barokas & Martin for purposes of the Baugh–Kilroy litigation. Thereafter, the two law firms jointly represented Baugh.

Several settlement meetings took place during October and November of 1983. Lloyd's was represented at most of these meetings. In the course of the negotiations, the assignment of Baugh's professional negligence claim against NAM Engineering to Kilroy was discussed as a potential term of the settlement. Lloyd's did not object to such an assignment prior to the execution of the settlement agreement, which included the assignment among its terms. The Baugh–Kilroy litigation settled on November 14, 1983.

In September 1982, Baugh commenced this declaratory action against its insurers, including Holland and Lloyd's, for reimbursement of the costs of defending Kilroy's claims and for indemnification. The other insurers settled with Baugh. Lloyd's eventually paid its share of the settlement, leaving for trial a claim for indemnification against Holland under Holland's policy and the duty-to-defend claims against each carrier.

The district court, in order to decide which allegations of property damage could trigger Holland and Lloyd's duties to defend Baugh, separated Kilroy's allegations into four types of damage:

(1) physical damage to the building itself and the cost of repair arising out of negligent design and construction of the floors and the seismic resistance system,

(2) loss of use of the building,

(3) permanent diminution in value of the building from the "taint" of having been a defective building and the reduced utility and changed orientation of space in the building after repair, and

(4) damage to tenant improvements and the cost of demolishing and replacing tenant improvements installed by Kilroy.

The court held that Holland's and Lloyd's policies excluded damage to the building itself, the cost of repair, and loss of use of

the building, items (1) and (2) above. The court ruled, however, that the diminution in value and the damage to tenant improvements claims, items (3) and (4), were covered as *consequential damages* under the Holland and Lloyd's policies, even though they occurred after the expiration of Holland's policy. These damages were not excluded by the faulty work, defective product, or design exclusions. The court held that once it was determined that property damage had been sustained during the relevant policy period, consequential damages resulting from the damaged property were covered no matter when they were sustained.

The district court found that both Lloyd's and Holland breached their duty to defend Baugh. Further, the court held that Holland must indemnify Baugh to the full extent of its $250,000 policy limit. The court also concluded that Lloyd's failure to object during settlement negotiations to Baugh's assignment of its claim against NAM Engineering estopped Lloyd's from asserting subrogation rights to the claim and found as a matter of law that Baugh had not breached the insurance agreement by its late tender. Lloyd's and Holland appeal.

## DISCUSSION

The main issue on appeal is whether Kilroy's allegations of damage to tenant improvements and diminution in the building's value arguably fall within the parameters of Lloyd's and Holland's policies, thereby triggering a duty to defend Baugh. Additionally, we must decide whether Holland must indemnify Baugh under the Holland policy. Lloyd's and Holland both contend that Kilroy's allegations did not create a duty to defend Baugh.

■ An indemnity policy insurer's duty to defend arises when a complaint alleges facts which, if proven, would render the insurer liable to indemnify the insured under the policy. *Waite v. Aetna Casualty & Sur. Co.*, 77 Wash.2d 850, 855, 467 P.2d 847, 851 (1970) (en banc); *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group*, 37 Wash.App. 621, 623, 681 P.2d 875, 877 (1984). The general rule

is that the insurer need not look beyond the pleadings to determine its liability. *Harrison Plumbing*, 37 Wash.App. at 623, 681 P.2d at 877; *R.A. Hanson Co. v. Aetna Ins. Co.*, 26 Wash.App. 290, 293, 612 P.2d 456, 458 (1980).

■ Several exceptions, however, require the insurer to look beyond the pleadings. The insurer cannot rely on the pleadings alone where the allegations are in conflict with facts known or facts reasonably ascertainable by the insurer. *R.A. Hanson*, 26 Wash.App. at 294, 612 P.2d at 459. Further, when the allegations of the complaint are ambiguous or inadequate, the insurer must investigate facts which might give rise to potential liability. *Id.* Thus, under modern rules of notice pleading there is a greater duty on the insurer to determine if a claim is potentially within the policy. *Id.*

■ We note that many of Lloyd's and Holland's arguments, based on evidence and facts eventually proven to exclude coverage, are irrelevant to the issue of whether the complaint alleged facts sufficient for potential liability. An insurer must defend the insured if a claim is potentially covered by a policy. The insurer's duty to defend is broader than its potential duty to indemnify. If, however, the allegations assert a claim that is not covered by the policy or bring the claim clearly within a policy exclusion, there is no duty to defend. *Waite*, 77 Wash.2d at 855, 467 P.2d at 851; 7C Appleman, *Insurance Law and Practice* § 4684.01 at 89 (1979).

We review de novo the district court's interpretation of state law. *In re McLinn*, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc). Under Washington law, which governs this case, the interpretation of a term in an insurance contract is treated as a question of law reviewed de novo. *Pacific Indem. Co. v. Bloedel Timberlands Dev., Inc.*, 28 Wash.App. 466, 468, 624 P.2d 734, 736 (1981).

## UNDERWRITERS AT LLOYD'S
### 1) POLICY COVERAGE

Lloyd's argues that Kilroy's claims failed to trigger a defense obligation because of

the lack of any claim alleging damage to the property of others which was not otherwise excluded by the policy. Lloyd's policy provides coverage:

> from and against all loss which the Assured may sustain or incur by reason of or in consequence of:
>
> (a) Any and all liability imposed by law against the Assured for loss of or damage to or destruction of property of others (including but not limited to, damage resulting from loss of use of property damaged or destroyed and all other indirect and consequential damage for which legal liability exists in connection with such damage to or destruction of property of others) sustained or alleged to have been sustained during the currency of this insurance and arising from any cause whatsoever out of the operations, activities, work and/or business of the Assured anywhere in the world, in connection with the Assured's business as stated above....

Specifically, Lloyd's contends that Kilroy's allegations fell outside of Lloyd's policy's coverage because: (1) there was no fortuitous act causing damage, (2) no damage to the property of others, and (3) the damage occurred outside of the policy period. Even if the claims initially fell within the policy's coverage, Lloyd's argues that the claims were excluded by the defective product exclusion, the faulty work exclusion, or the design exclusion. Additionally, Lloyd's contends that the court erred in not properly allocating defense costs, failing to release Lloyd's from liability because of Baugh's untimely tender, and estopping Lloyd's from raising a subrogation claim.

### a) *Fortuitous Event*

■ Lloyd's argues that its duty to defend did not arise because there was no fortuitous act causing damage. This contention is without merit. The crux of Lloyd's argument is that an insurer has no duty to defend claims against a contractor for failing to perform work as required. Lloyd's cites two cases, *Palouse Seed Co. v. Aetna Ins. Co.*, 40 Wash.App. 119, 697 P.2d 593 (1985), and *Harrison Plumbing*, as being on point. Yet Lloyd's fails to make the critical distinction between its case and the cited authorities. Both *Palouse Seed* and *Harrison Plumbing* dealt with intentional acts of the contractor. Here, Kilroy claimed damages for negligent acts of the contractor Baugh. Negligent and intentional acts are not the same. In essence, a fortuitous event is one that occurs by chance or accident and not by purposeful design. Nowhere is it contended that Baugh purposefully designed and/or constructed a defective building. The pleadings clearly state a claim for negligent design and construction. We find that the negligent construction and negligent design claims fall within the definition of a fortuitous event. *See Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, 93 Wash.2d 210, 217, 608 P.2d 254, 257 (1980) (en banc).

### b) *Property of Others*

■ Lloyd's contends that the policy gives rise to a duty to defend only in the event of "loss of or damage to or destruction of *property of others.*" The issue here is whether the building and the tenant improvements installed by Kilroy constitute the "property of others."

Lloyd's argues that any claim for damage to the building itself does not constitute damage to property of others. Lloyd's reasons that the building, exclusive of the tenant improvements, was Baugh's product since it was never substantially completed or accepted by Kilroy. Lloyd's contends that the building was what Baugh had contractually agreed to provide under the contract and thus cannot be the "property of others."

Lloyd's, however, overlooks the district court's finding of fact that title to Tower II, even during construction, was held by Kilroy. Even though Baugh constructed the building and the building was its product, the building was legally owned by Kilroy, thus qualifying as the "property of others" subject to coverage under the policy, unless barred by the exclusions.

■ Lloyd's does not contest that the tenant improvements were "property of others." Rather Lloyd's argues that damage to the improvements was not properly pled. This argument is without merit. The tenant improvements were installed by Kilroy and were not Baugh's product. The June 22, 1982, letter from Baugh's attorneys explicitly discussed the tenant improvement damage claims. Thus, Lloyd's could not ignore these claims, even if they were not expressly included in Kilroy's December 1981 counterclaim. *See R.A. Hanson,* 26 Wash.App. at 294, 612 P.2d at 459.

c) *No Occurrence Within Lloyd's Policy Period*

Lloyd's submits that only one event triggered the deficiencies in Tower II: Baugh's pouring the concrete for the building. Since the first seven floors were poured before the effective date of Lloyd's policy, Lloyd's contends the damage had already occurred prior to the policy period. This argument also must be rejected.

■ Lloyd's fails to note that the remaining floors were constructed during the pendency of its first policy. The damage to the upper floors took place at the time they were built and not before. As Baugh correctly contends, Lloyd's policy covers any liability for property damage *sustained during* the policy period. We hold that the damage to floors eight through eleven was sustained during the alleged negligent construction of those floors.[1]

■ Lloyd's contends that there was no damage to tenant improvements sustained during the currency of the policy because the damage to the tenant improvements, by their removal and replacement, did not occur until after the policy expired. We find that the improvements were damaged upon installation in the building. Because the building was defective, any nondefective improvements incorporated into the building would have to be removed in order to repair it. Removal of the improvements was required immediately after their instal-

lation. At the moment the improvements were incorporated into the building, the integrity of the improvements was in jeopardy and thus damaged. Just because the improvements were not demolished until a later date does not change the fact that the improvements were "doomed" immediately upon incorporation into the defective building. Because the tenant improvements were installed during Lloyd's policy, the improvements were damaged during the policy period.

In short, the diminution in value claim and the damage to tenant improvements claim both fall within the initial coverage provided by the Lloyd's policy. The question we must now address is whether the policy's exclusions for defective products, faulty work, or defective design preclude Baugh from recovering for either claim under the policy, thereby relieving Lloyd's of any duty to defend.

d) *Defective Product Exclusion*

The district court erred, Lloyd's argues, in concluding that the diminution in value claim was not excluded by the defective product exclusion. Lloyd's policy contained the following exclusionary clause:

> This insurance does not cover liability
> . . .
> (d) For claims made against the Assured
> (1) for repairing or replacing any defective product or products manufactured, sold or supplied by the Assured or any defective part or parts thereof nor for the cost of such repair or replacement, or
> (2) for the loss of use of any such defective product or products or part or parts thereof. . . .

The district court held that the office building was Baugh's product and that the defective product clause excluded coverage for damage to the building itself, the cost of repair, and loss of use. The court concluded that although the product exclusion denied coverage for repair and lost use of

---

1. We distinguish the time when this type of damage is sustained from damages attributable to the "taint" of the building becoming known

as defective. The latter damage is sustained when there is unfavorable publicity or general knowledge that the building is defective.

Tower II, other consequential damages (such as diminution in value) were not excluded.

### i) *Diminution in Value Claim*

■ The diminution in value claim is actually composed of three separate injuries: (1) reduced utility of the structure, (2) change in space orientation, and (3) taint of having been a defective building. We find that the first two elements are, in fact, a measure of damage directly resulting from the loss of use of the building itself. Any diminution in value because of altered space orientation or the reduced utility of the building is the direct result of permanent *loss of use* of the building and thus excluded by the defective product exclusion. The diminution in value claim based on the "taint" of Tower II being a defective building presents a different question.

The district court noted that the Tower II "taint" presumably resulted from the substantial publicity which surrounded the county's declaration that the building was not fit for habitation. In essence, the building's reputation was damaged by negative publicity. Kilroy asserted that under this theory, even assuming complete structural repair, the building's market value would be permanently diminished. The court held that this claim was neither an element nor a measure of the cost of repairing the building or of the lost use of the building and therefore not excluded under the policy. The court overlooked the fact that injury to a building may come in more than one form.

Here, we have two categories of injury: tangible and intangible. Tangible injury includes physical defects that can generally be repaired. Intangible injury, such as damage to reputation, may require unique and unusual solutions. Just because the injury cannot be fixed with cement and steel does not preclude the application of the defective product exclusion. Part of the value of the building is its reputation. The synergistic effect, i.e., reputation, created by a defect-free building, increases that building's value. Likewise, a damaged

building is reflected by a decline in its value.

Thus, damage to reputation is the same as damage to the building itself. There are several avenues to correct this type of damage. If the reputation of the building is damaged, for example, the remedy is to correct the defects in the building and to provide enough advertising to rectify any taint. These costs seem to be the costs of repairing a damaged product, albeit that some of the repairs are for intangible damage.

Another solution is to tear the building down and erect a new and perfect building. Theoretically, either approach rectifies any prior taint. Both approaches, however, are employed to repair or replace a defective product. Since the building is a product of Baugh, any diminution in value in the building is a direct result of the building being a defective product.

Baugh relies on *United States Fire Ins. Co. v. Roberts & Schaefer Co.*, 37 Wash. App. 683, 683 P.2d 600 (1984), to support the court's finding that the diminution in value was neither an element nor a measure of Kilroy's claim for repair or for loss of use. In *Roberts*, a coal storage silo built by the insured collapsed. The coal plant had to close for a month during cleanup of the rubble. Had it simply lost use of the silo, the plant could have continued to operate. The contractor sought indemnity for lost revenues claimed by the coal plant as a result of the collapsed silo. The policy in question excluded claims "for the loss of use of any such defective product or products or part or parts thereof." 37 Wash. App. at 685, 683 P.2d at 601. The court held that "[w]here a defective component has a detrimental effect on an entity *unrelated* to loss of function of the component itself, coverage is not barred by an exclusion relating to loss of use of a defective product." 37 Wash.App. at 687, 683 P.2d at 603 (emphasis in original).

The *Roberts* court distinguished *American States Ins. Co. v. Hurd Bros., Inc.*, 8 Wash.App. 867, 509 P.2d 1015 (1973), in which a similar exclusion was construed to deny coverage. In *American States*, a

malfunctioning air ventilation system in a potato storage shed caused the potatoes to be removed one month early to prevent spoilage. The insured sought recovery of lost storage charges caused by the early removal of the potatoes. The court, among other reasons, denied coverage because the exclusionary clause provided that "[d]amages for loss of use of a defective product or loss of use of property resulting therefrom are excluded from coverage." *American States*, 8 Wash.App. at 871, 509 P.2d at 1018.

The *Roberts* court focused on the fact that the lost revenue of the coal plant was not directly caused by the loss of use of the defective product, the silo. Our case is more akin to *American States*, because the diminution in value claim seeks recovery for the detrimental effect the defective building has on itself, not on an unrelated component as in *Roberts*. In other words, the claim was directly caused by the defective product.

All of the other cases cited by the parties are distinguishable as they deal with a defective product incorporated into otherwise nondefective property of a third party. Here the damage is a result of the defective product itself. We conclude that the diminution in value claim is excluded under the defective products exclusion, and thus Lloyd's had no duty to defend Baugh against it.

ii) *Removal and Replacement of Tenant Improvements*

 Lloyd's contends that the removal and replacement of the tenant improvements were incurred to fix the building (Baugh's "product") and thus were excluded under the policy. The district court held that the defective product clause excludes the costs of repair and replacement of the defective product itself but not the damage caused to "other property" in effectuating such repairs.

Lloyd's reliance on *Ross Island Sand and Gravel Co. v. General Ins. Co. of Am.*, 472 F.2d 750 (9th Cir.1973), *aff'g* 315 F.Supp. 402 (D.Or.1970), is unwarranted. In *Ross,* the policy specifically covered only

damage to property of others not "caused or necessitated by the repair or replacement of ... the product." *Ross*, 315 F.Supp. at 404. No such language exists in Lloyd's policy. Lloyd's also incorrectly relies on *General Ins. Co. v. International Sales Corp.*, 18 Wash.App. 180, 566 P.2d 966 (1977). There, the court found no liability existed because no damage to property of others had occurred. The other cases cited by Lloyd's are also inapplicable. We find that the defective product exclusion does not bar the claim for damage to the tenant improvements.

e) *Faulty Work Exclusion*

 Lloyd's argues that the court erred by interpreting the faulty work exclusion as applying only to claims for repair or replacement of defective parts of the Baugh work, but not to claims for damage to nondefective parts of Baugh's work. The policy excludes claims made "for damage to that particular part of any property upon which the Assured is or has been working caused by the faulty manner in which the work has been performed...." This exclusion was considered in *Blackfield v. Underwriters at Lloyd's, London*, 245 Cal.App.2d 271, 53 Cal.Rptr. 838 (1966).

In *Blackfield*, the court of appeal held that Lloyd's had a duty to defend a construction company against claims alleging damages from faulty construction of a house foundation. The court interpreted the identical exclusions claimed by Lloyd's here and held that the policy did not exclude liability for damages *unrelated* to the actual cost of repairing or replacing the defective part of the product. 245 Cal.App. 2d at 275–76, 53 Cal.Rptr. at 841. We agree, and find that the exclusion for damage to Baugh's work does not exclude the claim for damage to tenant improvements.

f) *Design Exclusion*

 Lloyd's policy also excludes liability for damages due to design defects. The exclusion states:

This insurance does not cover liability ...

(h) Arising out of the rendering of, or the failure to render, professional services by or on behalf of the insured, for others, in the insured's capacity as an architect, engineer or surveyor, including, but not limited to, any negligent act, error, omission or mistake involving the preparation of surveys, maps, plans, designs or specifications or supervisory inspection or engineering services furnished in connection therewith.

The district court found that this design exclusion prevents Baugh from recovering those damages arising out of defective designs or plans for the construction of Tower II. We agree with the district court's analysis. Even though NAM Engineering, and not Baugh, produced the building's structural designs, the Baugh–Kilroy contract clearly assigned Baugh liability for any structural design defects. Thus, Baugh's "capacity as an engineer" with respect to Kilroy brought it within this particular exclusion for any damages arising from design defects.

■ We disagree, however, with Lloyd's contention that the exclusion disposes of all of Kilroy's damage claims, and eliminated any duty to defend Baugh. Kilroy's December 1981 counterclaim alleged damages based both on negligent design and on negligent construction. As the district court recognized, Lloyd's would still have a duty to defend Baugh against damage claims for negligent construction, even though it had no duty to defend against claims based on negligent design.

Lloyd's contention that the design exclusion also excludes damages based on negligent construction is simply without merit. It is in essence an argument that an insured cannot recover on claims alleging alternative theories of liability if one of the theories is excluded from coverage. This contention fails in alternate theory pleading practice. *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir.), *cert. dismissed*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed. 2d 706 (1985); Fed.R.Civ.P. 8(e)(2). The district court merely held that the defective design theory was excluded from coverage but that there may be a claim under negli-

gent construction. *See Safeco Ins. Co. of Am. v. Guyton*, 692 F.2d 551, 553–55 (9th Cir.1982).

We find, therefore, that Lloyd's had a duty to defend Baugh against Kilroy's tenant improvement damage claims, since the complaint alleged that those damages were due to negligent construction.

## 2) ALLOCATION OF DEFENSE COSTS

Lloyd's argues that the trial court erred by refusing to allocate attorney's fees and other expenses between covered and excluded claims as required by *Waite v. Aetna Casualty & Sur. Co.*, 77 Wash.2d 850, 856, 467 P.2d 847, 852 (1970) (en banc). The *Waite* court held that defense costs must be allocated when there exists a reasonable basis for doing so. The district court in fact, contrary to Lloyd's position, allocated the defense costs. It excluded from costs any fees or expenses incurred prior to Baugh's tender of defense to Lloyd's on June 29, 1982. Lloyd's was not held responsible for fees related to Baugh's lien claim, Kilroy's earlier counterclaim not involving negligent design or construction of Tower II, Baugh's surety dealings, and Baugh's dealings with its indemnity carriers. Lloyd's was also relieved from costs related to warranty work on Tower II, and Baugh's claim of unfavorable administration of the contract. The only expenses the court was unable to allocate were those related to the allegations of negligent design and construction. The court found that the allegations of negligent design and construction "were substantially interrelated" and necessary for Baugh's defense of Kilroy's claims for diminution of value, damage to tenant improvements, and demolition and repair of tenant improvements. The court found it impossible to allocate fees and costs reasonably between these claims.

Lloyd's also contends that it is not liable for the fees and costs Baugh incurred in its attempts to get approval of a plan that would bring Tower II into compliance with its contractual obligations and the Uniform Building Code. The court found, however, that these expenses were reasonable be-

cause if the "fix" were approved, then the demolition and replacement of the tenant improvements would not have been required. Lloyd's does not contest this finding of reasonableness.

We find that the trial court did not err in its allocation of defense costs under its theory of the case. However, in light of our opinion relieving Lloyd's of responsibility for the defense of the diminution in value claim, which we find was not covered by Lloyd's policy, the district court should examine whether the diminution in value claim is so "substantially interrelated" to the tenant improvement claim—both of which arose from the same negligent design and construction allegations—as to make allocation of defense costs impossible.

### 3) TIMELY NOTICE

Lloyd's contends that it was prejudiced as a matter of law by Baugh's failure to tender defense for six months. The district court found that Lloyd's suffered no prejudice as a result of Baugh's failure to notify Lloyd's of the Kilroy counterclaim prior to June 1982.

■ An insurer may be released from its responsibilities if it was actually prejudiced by the insured's conduct. *Felice v. St. Paul Fire and Marine Ins. Co.,* 42 Wash.App. 352, 358, 711 P.2d 1066, 1070 (1985). Prejudice is presumed only in extreme cases, and the party claiming prejudice has the burden of proof. 42 Wash. App. at 359, 711 P.2d at 1070. The issue of prejudice is generally one of fact. *Id.*

Lloyd's fails to show that the court committed clear error in determining that there was no prejudice. The authorities cited by Lloyd's do not support a finding of prejudice as a matter of law in this case. *See Felice,* 42 Wash.App. at 359–60, 711 P.2d at 1070 (prejudice where notice of claim given to insurance company one day before the end of thirty-day appeal period); *Sears, Roebuck & Co. v. Hartford Accident & Indem. Co.,* 50 Wash.2d 443, 452–53, 313 P.2d 347, 352–53 (1957) (prejudice where insurer notified of claim one week before trial).

### 4) SUBROGATION

■ Lloyd's policy contained a clause requiring insured parties to subrogate all third-party claims to Lloyd's. Lloyd's contends that the district court erred in estopping it from bringing a claim for breach of the subrogation clause against Baugh, who had assigned to Kilroy as a part of its settlement with Kilroy its claim against NAM Engineering.

The court found that Lloyd's failure to object to the assignment when it was discussed during settlement negotiations estopped it from objecting after the settlement was finalized.

Lloyd's counters that equitable estoppel by silence is not recognized by Washington courts. We disagree. Washington recognizes this type of equitable estoppel. *Huff v. Northern Pacific Ry. Co.,* 38 Wash.2d 103, 114–15, 228 P.2d 121, 128 (1951). Lloyd's was properly estopped from asserting the breach of the duty to subrogate.

## HOLLAND INSURANCE COMPANY

### 1) POLICY COVERAGE

Holland contends that the court erred in holding it liable for Kilroy's claims against Baugh because the damages were sustained after the expiration of Holland's policy. Although Holland admits that its policy covers consequential damages, it contends that the consequential damages must be sustained during the policy period. Holland's policy, which is nearly identical to Lloyd's, provides coverage:

> from and against all loss which the Assured may sustain or incur by reason of or in consequence of:
>
> (a) Any and all liability imposed by law against the Assured for loss of or *damage* to or *destruction* of property of others (*including* but not limited to, damage resulting from loss of use of property damaged or destroyed and all other indirect and *consequential damage* for which legal liability exists in connection with such damage to or destruction of property of others) *sustained or alleged to have been sustained during the currency of this*

*insurance* and arising from any cause whatsoever out of the operations, activities, work and/or business of the Assured

....

(emphasis added). The district court found that the tenant improvements claim alleged consequential damages flowing from property damage to Tower II. Baugh argues that the court correctly held that only the underlying damage to the property of others, not the resulting consequential damage or liability, must be sustained during the policy period. Further, Baugh argues that the policy is ambiguous in this regard and thus, under Washington law, the construction most favorable to the insured must be employed.

In construing the insurance policy, courts must give the policy language its popular and ordinary meaning. *Transamerica Ins. Co. v. Preston,* 30 Wash.App. 101, 104, 632 P.2d 900, 902 (1981). The language of a contract is ambiguous if its terms are uncertain or capable of having various meanings. *Rydman v. Martinolich Shipbuilding Corp.,* 13 Wash.App. 150, 153, 534 P.2d 62, 64 (1975). If the contract language is unambiguous, the meaning of the contract is determined from the language alone. 13 Wash.App. at 153, 534 P.2d at 63.

 The plain language of Holland's policy provides coverage only for those damages, including consequential damages, "sustained or alleged to have been sustained during" the policy period. The policy clearly defines the time during which the damage must occur. There is no ambiguity. Holland's policy covered the period from June 1978 to March 1979. Kilroy commenced the installation and construction of the tenant improvements in November of 1979, well after the expiration of Holland's policy coverage. Any damage sustained to the tenant improvements did not occur within Holland's policy period. Accordingly, we hold that the district court erred in finding Holland liable for damage to the tenant improvements.

Similarly, we find that the diminution in value claim also fell outside of Holland's policy. As previously discussed, *see supra* at 1167, the diminution in value claim is composed of three parts. The reduced utility of the structure and the change in space orientation elements are excluded by Holland's defective product exclusion which is the same as Lloyd's. Thus we need to address only the issue of damages resulting from the "taint" of Tower II being a defective building.

On August 13, 1982, King County ordered that Tower II be vacated due to inadequacies in its construction. The county's declaration that the building was not fit for habitation generated substantial negative publicity. As the district court noted, this publicity created a "taint" resulting in a diminution in the value of the building. The county's August 1982 declaration occurred well after Holland's policy expired. The negative publicity accordingly followed after that date. Thus, no damage could have occurred during the Holland policy. Holland is therefore not liable for any diminution in value.

We find that both claims made against Holland were for damages sustained outside of Holland's policy coverage period. We hold that the district court erred in finding that Holland breached its duty to defend and in ordering Holland to indemnify Baugh. Accordingly, we reverse the district court with respect to Holland and hold Holland free from all liability.

## CONCLUSION

We conclude that Lloyd's did not have a duty to defend the diminution in value claim but that Lloyd's was obligated to defend Baugh from Kilroy's claim alleging damage to tenant improvements. Further, we affirm the district court's finding that Baugh's late tender of defense was not prejudicial. We also conclude that Lloyd's was estopped from asserting breach of its rights under the policy subrogation clause after its failure to object timely to the assignment of Baugh's claim against NAM Engineering to Kilroy. The district court may wish to reallocate defense costs, taking into account our holding on the diminution in value claim and the teachings of

# 1176

*Waite v. Aetna Casualty & Sur. Co.*, 77 Wash.2d at 856, 467 P.2d at 852.

With respect to Holland, we reverse the district court. Both damage claims made against Holland occurred after the expiration of its policy. Thus, Holland had no duty to defend or indemnify Baugh.

Baugh is awarded its costs of appeal against Lloyd's, and Holland is awarded its costs against Baugh.

AFFIRMED in part, REVERSED in part, and REMANDED.